IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

DENNIS L. CONN,                          :

    Plaintiff,                       :
                                                        Case No. 3:08cv00148

  vs.                                  :
                                                        District Judge Thomas M. Rose

MICHAEL J. ASTRUE,                       :   Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,                 :

    Defendant.                       :

**REPORT AND RECOMMENDATIONS**[1]

**I.   INTRODUCTION**

    Various health problems led truck driver Plaintiff Dennis L. Conn to twice file for Disability Insurance Benefits (DIB). The Social Security Administration denied his first DIB application during the early stages of administrative review. (Tr. 31-36). He did not appeal that denial, and his first DIB application is not at issue in this case.

    This case concerns Plaintiff's second DIB application, which he filed in March 2005. Plaintiff asserted a disability onset date of June 1, 2002, and he met the financial requirements for DIB eligibility through June 30, 2003. As a result, his second application effectively claimed that he was eligible for DIB from June 1, 2002 until June 30, 2003. (Tr. 21, 94-96).

    The Social Security Administration denied Plaintiff's second DIB application at each stage of administrative review. The most significant stage for present purposes involved an administrative hearing and a resulting decision by Administration Law Judge

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

(ALJ) David A. Redmond. In his decision, ALJ Redmond determined that Plaintiff was not under a "disability" as defined by the Social Security Act and that he was consequently not eligible to receive DIB. (Tr. 14-23).

ALJ Redmond's decision later became the final determination of the Commissioner of the Social Security Administration. Such final determinations are subject to judicial review, *see* 42 U.S.C. §405(g), which Plaintiff is now due.

The case is presently before the Court upon Plaintiff's Statement of Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #11), the administrative record, and the record as a whole.

Plaintiff seeks at a minimum, an Order remanding this case to the Social Security Administration to correct certain errors. The Commissioner seeks an Order affirming the ALJ's decision.

## II.     ADDITIONAL BACKGROUND

### A.     **Plaintiff and the Hearing Testimony**

Plaintiff was forty-seven years old at the time of his date last insured (June 30, 2003), and he is thus considered a "younger individual" for purposes of resolving his DIB claim. *See* 20 C.F.R. §404.1563(c), *see also* Tr. 29. Plaintiff has a high school education, through special education classes. *See* 20 C.F.R. § 404.1564(b)(4), *see also* Tr. 139-40.

Plaintiff testified during the ALJ's hearing that he has difficulty reading and writing. He reads the newspaper only to look at car advertisements or at "want ads and stuff like that." (Tr. 359). He has a driver's license, but his doctor recommended that he not drive due to his medications. *Id.*

Plaintiff further testified that he stopped working in June 2002 due to neck pain, pain at the base of his skull, and pain between his shoulders as well as a loud and constant high-pitched ringing in his ears. (Tr. 359-60).

Dr. Hutson testified as a medical expert during the ALJ's hearing. Dr. Hutson's

review of Plaintiff's medical records indicated that he underwent back surgery in July 2002, specifically a cervical disk incision and fusion at C-6-7. (Tr. 361). Dr. Hutson observed that after the surgery, one of the surgically implanted screws broke. *Id.* Dr. Hutson explained that Plaintiff underwent a second back surgery "to redo the anterior cervical disk and fusion and ... two new screws were put in place." *Id.* Dr. Hutson testified that Plaintiff had a vertobrogenic disorder, which did not meet or equal the requirements of an impairment in the Commissioner's Listings of Impairments.[2] (Tr. 362).

Plaintiff testified that he had limited range of motion in his neck. (Tr. 364). He agreed with Dr. Hutson's suggestion that when he turned his neck, it sounded like "rice krispies, and "it makes a lot of noise." (Tr. 364-65). During the hearing, when Plaintiff briefly demonstrated his range of motion in his neck, Dr. Hutson opined, "He's got about half the normal motion ... in his neck." (Tr. 365).

Plaintiff also described weakness and pain in his right arm. And he stated that his left arm hurts, but his right arm and shoulder hurt more than his left arm. (Tr. 365).

Plaintiff estimated that he was unable to be on his feet for more than 30 minutes because of fatigue and pain. (Tr. 366-67). He could sit for two to three hours, but then he needed to lie down for at least an hour. He noted that most days he lies down two or three times a day. He explained that if he tries to do more, like help with the laundry, it "stirs it up or something in there, and I get in a great deal of pain." (Tr. 367).

### B. Plaintiff's First Spinal Surgery

Plaintiff began receiving treatment from family physician Robert C. Landes, M.D. in December 1995. (Tr. 190-235, 333-53). In May 2002, due to complaints of a sudden onset of pain in the left side of his neck and shoulder with pain through his fingers (Tr. 146), an EMG was ordered, which showed a moderate left carpal tunnel syndrome. (Tr.

---

[2] *See infra*, §III.

204-05). An MRI of the cervical spine taken June 1, 2002, showed disc protrusions at a number of levels and a herniated disc at C6-7 with impingement of the cord and narrowing of the neural foramen. (Tr. 295).

On July 18, 2002, neurosurgeon Gary E. Kraus, M.D. performed Plaintiff's first spinal surgery – an anterior cervical discectomy (C6/7). (Tr. 154-55). Two months after surgery, Dr. Kraus saw Plaintiff for a follow-up examination and noted that Plaintiff was doing very well. Plaintiff's strength had returned to normal in his left triceps, he had no weakness, no pain, and he was not taking any medications. Dr. Kraus also reported that x-rays of Plaintiff's cervical spine looked excellent. (Tr. 288).

On October 3, 2002 – after Plaintiff's first spinal surgery but before Plaintiff's second spinal surgery – Dr. Landes noted that Plaintiff "is having no pain." (Tr. 201). Dr. Landes also noted that Plaintiff had recently returned to work. *Id*.

On November 21, 2002, Dr. Kraus saw Plaintiff for his four-month post-op visit. Dr. Kraus observed that Plaintiff's strength was excellent and that he was having no pain. Plaintiff informed Dr. Kraus that he would like to return to work. Dr. Kraus felt Plaintiff would be able to do so as long as he did not lift more than 20 pounds. Dr. Kraus released Plaintiff for work and stated that he was very pleased with Plaintiff's improvement and his progress. (Tr. 285).

At this time, November 21, 2002, Plaintiff's insured status for DIB eligibility had yet to expire and did not do so until June 30, 2003. (Tr. 15). However, before Plaintiff's insured status expired, he re-injured himself.

### C. Plaintiff's Fall and Second Spinal Surgery

In January 2003 Plaintiff fell off a tanker and broke his surgical screws. (Tr. 282, 283-84). Dr. Kraus recognized that after Plaintiff fell, he had pain between his shoulders, traveling down his arms. *Id*. Plaintiff also had ringing in his ears and headaches. *Id*.

In March 2003 Dr. Landes noted that Plaintiff had quit his truck driving job "because his truck driving was slow and business was slow." (Tr. 201). Dr. Landes also

noted that Plaintiff's affect was appropriate and that there was no sign of anxiety or depression. Examination revealed Plaintiff's neck was supple without adenopathy. (Tr. 201).

In September 2003 – after Plaintiff's insured status expired (on June 30, 2003) – returned to see Dr. Kraus and underwent a cervical MRI, which revealed that his surgical screws had broken post injury. (Tr. 283-84). The MRI also showed disc bulges at C6-7, C5-6, C4-5, and C3-4. *Id.*

Plaintiff underwent his second spinal surgery in January 2004. (Tr. 238-39, 258, 284). His surgeon, again Dr. Kraus, re-fused his neck, placing two new screws in the C6 vertebral body. (Tr. 250-51). One month later Plaintiff complained of "some weakness" and he felt that "his right arm is weaker than his left." (Tr. 258). Dr. Kraus noted good strength bilaterally. *Id.* And Dr. Kraus noted, "no weakness, arms are symmetrical. I did review his film which is good. He has no pain down his arm and no numbness or tingling to his fingers. He is taking Tylenol with Codeine and I recommend he take some ibuprofen for anti-inflammatory pain. He is to continue his activity and to wear his brace. The x-ray of his cervical spine looks good and his wound is well healed." (Tr. 258).

In November 2005 – well after Plaintiff's date last insured for DIB purposes – treating physician Dr. Landes opined that Plaintiff could perform sedentary work on a part-time basis but could never perform light work. According to Dr. Landes, Plaintiff could not sit, stand, or walk for more than five-to-six hours a day and lifting was limited to ten pounds occasionally and five pounds frequently. Dr. Landes further opined that Plaintiff was limited in his performance of most postural activities and thought that Plaintiff should avoid moving machinery and marked changes in weather. Dr. Landes believed that if Plaintiff returned to work, it would be expected that he would be absent five or more days each month due to an exacerbation of his condition. (Tr. 333-35). Dr. Landes specifically noted that his opinion concerned Plaintiff's condition between June 1, 2002 and June 30, 2003. (Tr. 335).

D.  **Additional Evidence**

The administrative record also contains the opinions of non-treating medical professionals.

Plaintiff was evaluated by James C. Tanley, Ph.D., at the request of the Ohio Bureau of Disability Determination on November 25, 2003.  Plaintiff reported that he had never seen a psychologist prior to this examination.  Dr. Tanley administered the WAIS-III, which resulted in the borderline range of intelligence.  Dr. Tanley diagnosed Plaintiff as having an adjustment disorder with a depressed mood and a pain disorder associated with both psychological factors and a general medical condition.  He assigned Plaintiff a GAF[3] of 50, indicating he had "serious symptoms ... or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)...." Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at p. 34 (DSM-IV-TR). Dr. Tanley opined that Plaintiff was mildly impaired in terms of his ability to relate to others; he could understand and follow simple instructions and maintain attention to perform simple, repetitive tasks within the context of his borderline intelligence; and his ability to withstand the stress and pressure of daily work was severely impaired.  (Tr. 172-75).

Psychologist David W. DeMuth, Ph.D. reviewed the record on December 30, 2003 and opined, "Dr. Tanley says [Plaintiff] can[']t work due to stress but physical problems seem to be major reason he can not do work."  (Tr. 177A).  Dr. DeMuth checked boxes on a form mostly indicating that Plaintiff was not significantly limited in mental work abilities with the exception of "marked" limitations in his ability to understand and remember and carry out detailed instructions.  (Tr. 176-77).

---

[3] "GAF" (Global Assessment of Functioning) is a tool used by health care professional; it is, in general, a snapshot of a person's "overall psychological functioning" at or near the time of the evaluation. *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at 32-34.

On January 7, 2004, Dr. DeMuth opined that Plaintiff would have problems relating to the general public effectively and would have problems competing in a complex, fast paced working environment. (Tr. 298-314). He found that Plaintiff: (1) had a mild restriction of his activities of daily living; (2) had a moderate restriction in his ability to maintain social functioning; and in his ability to concentrate, persist, or maintain pace; and (3) had not experience repeated episodes of decompensation. (Tr. 309).

## III. THE "DISABILITY" REQUIREMENT AND ADMINISTRATIVE REVIEW

The Social Security Administration provides DIB to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §423(a)(1)(D). The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity. *See* 42 U.S.C. §423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70. A DIB applicant bears the ultimate burden of establishing that he or she is under a "disability." *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Secretary of Health and Human Services*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

The term "disability" – as defined by the Social Security Act – carries a specialized meaning of limited scope. Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are "medically determinable" and severe enough to prevent the claimant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence. *See* Tr. 14-15; *see also* 20 C.F.R. §404.1520(a)(4). Although a dispositive finding at any Step terminates the ALJ's review,

7

*see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Has the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity,[4] can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can he or she perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

**IV.    ALJ REDMOND'S DECISION**

ALJ Redmond determined at Step 1 of the sequential analysis that Plaintiff had not engaged in any substantial gainful activities after his alleged disability onset date of June 1, 2002. (Tr. 15, 21).

At Step 2 the ALJ determined that Plaintiff suffered from the severe impairments of degenerative joint disease of the cervical spine, degenerative disk disease of the cervical spine, the residuals of two cervical diskectomies, noninsulin-dependent diabetes mellitus, adjustment disorder, pain disorder, and borderline intellectual functioning. (Tr. 22).

The ALJ concluded at Step 3 that Plaintiff did not meet or equal the criteria of the

---

[4] The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

Listings. *Id.*

At Step 4 the ALJ assessed Plaintiff's Residual Functional Capacity as follows:

> Through the time that he last met the special earnings requirements of the Act, the claimant was capable of performing the basic exertional requirements of sedentary work, as such work is defined for Social Security purposes. However, his 'severe' impairments resulted in neck pain, reduced spinal mobility, fatigue, decreased concentration, an inability to perform complex tasks and diminished interpersonal skills. He was limited to simple tasks that would have afforded him the opportunity to alternate between sitting and standing as required for comfort. He was further limited to jobs that would not have required reaching overhead, and which would have involved only minimal personal contacts.

(Tr. 22).

The above conclusions, along with the ALJ's findings throughout his sequential evaluation, led him to conclude that Plaintiff was not under a disability and thus not eligible for DIB.

## V. JUDICIAL REVIEW

Judicial review determines whether substantial evidence in the administrative record supports the ALJ's factual findings. *Bowen v. Comm'r. of Soc. Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007). "Substantial evidence is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Bowen*, 478 F3d at 746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)). It consists of "'more than a scintilla of evidence but less than a preponderance...'" *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review for substantial evidence is deferential not *de novo*. *See Cruse v. Commissioner of Social Sec.* 502 F.3d 532, 540 (6th Cir. 2007); *see also Cutlip v. Secretary of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). An ALJ's factual findings must be upheld "as long as they are supported by substantial evidence." *Rogers*, 486 F.3d at 241 (citing *Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-

90 (6th Cir. 1999). Once substantial supporting evidence is found in the administrative record, courts do not consider whether they agree or disagree with the ALJ's findings or whether the administrative record contains contrary evidence. *Rogers*, 486 F.3d at 241; *see Her*, 203 F.3d at 389-90.

Substantial evidence is not the analytical ending point. Judicial review further considers whether the ALJ "applied the correct legal criteria." *Bowen*, 478 F.3d at 746. If the ALJ does not, the decision may not be upheld even if the findings are supported by substantial evidence. *See id*. For example, a decision will not be upheld where the ALJ failed to apply mandatory procedural rules and standards established by the Commissioner's Regulations and where that failure prejudices a claimant on the merits or deprives the claimant of a substantial right. *See id*. (and cases cited therein).

## VI. DISCUSSION

### A. Closed Period of Disability

The pertinent period of time at issue concerns Plaintiff's work abilities and limitations between June 1, 2002 until June 30, 2003. (Tr. 15, 94-96). Plaintiff bears the burden of establishing he was under a disability during that time, particularly before June 30, 2003, the date he was last insured for DIB. *See* Tr. 15; *see also Richardson v. Heckler,* 750 F.2d 506, 509 (6th Cir. 1984); *Moon v. Sullivan,* 923 F.2d 1175, 1182 (6th Cir. 1990).

At least one unpublished Sixth Circuit case, *Strong v. Social Sec. Admin.*, 88 Fed. Appx. 841, 845 (6th Cir. 2005), places little value on post-insured status evidence. *Strong* provides, "Evidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Social Sec. Admin.*, 88 Fed. Appx. 841, 845 (6th Cir. 2005). *Strong*, however, relies on *Cornette v. Sec'y. of Health & Human Servs.*, 869 F.2d 260, 264 n.6 (6th Cir. 1988), which did not specifically announce this general rule but instead merely recognized that the plaintiff's testimony during his administrative

hearing pertained mainly to his post-insured condition and thus shed little light on his condition before his insured status expired. *Cornette*, 869 F.2d at 264 n.6.

Care should therefore be taken not to read *Strong* or *Cornette* (or similar cases) as wholly disapproving of evidence dated after a claimant's insured status expired. Instead, post-insured status evidence can be probative of whether the claimant was under a disability before the date his or her insured status expired. *See Higgs v. Bowen*, 888 F.2d 860, 863 (6th Cir. 1988) (stating parenthetically, "evidence of medical condition after insurance cutoff must be considered to the extent it illuminates claimant's health before that date," citing *Martonik v. Heckler*, 773 F.2d 236, 240-41 (8th Cir. 1985)); *see, e.g., Johnson v. Secretary of Health and Human Services*, 679 F.2d 605 (6th Cir. 1982); *Taylor v. Sec'y. of Health & Human Servs.*, 1989 WL 153548 at **4 (6th Cir. 1989).

At least one other Circuit has specifically held, "medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period." *Halverson v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984). And it might well be "error for an ALJ to simply ignore evidence that post-dates the insured period. The question in such cases is whether the evidence that post-dates the relevant period is 'sufficient to support the earlier evidence.'" *Blom v. Barnhart*, 363 F.Supp.2d 1041, 1049 n.6 (E.D. Wis. 2005)(citation omitted); *cf. Johnson v. Secretary of Health, Educ. and Welfare*, 679 F.2d 605, 606-07 (6th Cir. 1982)(fact that plaintiff was voluntarily committed to hospital with severe mental illness should have been considered when determining whether he had been disabled for a prior twelve-month period); *Paquette v. Sullivan*, 1990 WL 66814 at **2 (6th Cir. 1990)("Post-insured status evidence may be considered only if it sheds light on the a claimant's condition during the insured period.").

### B. <u>Analysis</u>

#### 1.

Plaintiff contends that the ALJ erred by rejecting the disability opinion provided by his long term treating physician Dr. Landes in November 2005. (Tr. 333-35). Plaintiff

11

points out that Dr. Landes' opinion concerning Plaintiff's inability to *sustain* work activity for more than six hours a day was consistent with disability. Plaintiff also contends that the ALJ erred by not continuing his evaluation of Dr. Landes' opinion after determining that it was not due controlling weight and that the ALJ erred by failing to provide good reasons for rejecting Dr. Landes' opinion.

The Commissioner contends that the ALJ properly rejected Dr. Landes' opinion because Dr. Landes provided no objective support for his conclusion and because his opinion was contradicted by Dr. Kraus, Plaintiff's treating neurosurgeon. The Commissioner further argues that ALJ correctly recognized that Plaintiff's second spinal surgery did not occur until after his date last insured and was consequently not relevant to the issue of whether Plaintiff was under a disability before his date last insured.

**2.**

The treating physician rule, when applicable, requires ALJs to place controlling weight on a treating physician's opinion rather than favoring the opinion of a nonexamining medical advisor, or an examining physician who saw a claimant only once, or a medical advisor who testified before the ALJ. *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004); *see Lashley v. Secretary of Health and Human Services,* 708 F.2d 1048, 1054 (6th Cir. 1983); *see also* 20 C.F.R. §404.1527(d)(2), (e), (f). A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and if it is not inconsistent with other substantial evidence of record. *Wilson*, 378 F.3d at 544; *see Walters v. Commissioner of Social Security*, 127 F.3d 525, 530 (6th Cir. 1997); *see also* 20 C.F.R. §404.1527(d)(2).

If a treating physician's opinion is not given controlling weight, then it must be weighed against other medical source opinions under a number of factors set forth in the Commissioner's Regulations – "namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and

the specialization of the treating source – in determining what weight to give the opinion." *Wilson*, 378 F.3d at 544 (citing 20 C.F.R. §404.1527(d)(2)).

More weight is generally given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. §404.1527(d)(1). However, the opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight. This occurs because the Commissioner views nonexamining sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p. Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as treating physicians including supportability, consistency, and specialization. *See* 20 C.F.R. §404.1572(d), (f); *see also* Ruling 96-6p at *2-*3.

**3.**

In November 2005 Dr. Landes opined that the Plaintiff would be unable to perform even sedentary work on a full-time basis. (Tr. 333-35). The ALJ rejected this opinion by recognizing that Dr. Landes "provided no objective support for this conclusion." (Tr. 19). The ALJ further explained that Dr. Lanes' opinion "is contradicted by the medical opinion of the claimant's treating neurosurgeon, who released claimant to return to work with a lifting limitation of twenty pounds. Accordingly, I decline to afford it controlling weight in this matter, though I have considered it in formulating the claimant's residual functional capacity." *Id*.

By declining to apply controlling weight to Dr. Landes' opinion based on his omission of supporting objective medical evidence, the ALJ did not err as a matter of law. *See* 29 C.F.R. §404.1527(d)(2). A review of the form Dr. Landes' completed reveals that he, as the ALJ recognized, did not refer to objective medical evidence. *See* Tr. 333-35. Substantial evidence – Dr. Landes' form itself – therefore supports the ALJ's reason for

declining to give Dr. Landes' opinion controlling weight.

Plaintiff argues that whether Dr. Landes referred to objective medical evidence in the form he completed is not the issue. Instead, according to Plaintiff, the issue is whether "the objective record as a whole supports the opinion." (Doc. #9 at 10). Yet Plaintiff does not cite to any case law or Regulation to support his contention and he does not offer pertinent supporting analysis. *See id*. at 9-10. Despite this, Plaintiff might be correct in his use of objective evidence beyond the four corners of Dr. Landes' opinion because ALJs are charged with the duty to review all the record evidence relating to a disability claim. *See* 29 C.F.R. §404.1527(c). Assuming, therefore, that Plaintiff is analytically correct to turn to other objective medical evidence as a basis for crediting Dr. Landes' opinion, the other objective evidence upon which Plaintiff relies supports neither his attempt to show error in the ALJ's decision nor his reliance on Dr. Landes' opinion.

The evidence on which Plaintiff relies relates to his second spinal re-fusion surgery in January 2004. The ALJ accurately noted that this second surgery occurred after Plaintiff's date last of insured of June 30, 2003. *See* Tr. 16. Although this alone is not a reason to completely discount the January 2004 evidence, *see supra*, §VI(A), the evidence relating to the January 2004 surgery does not tend to show the existence of a prior ongoing spinal injury during the time period at issue. This is so mainly because Plaintiff recovered very well from his first spinal surgery. This is shown, as the ALJ observed, by Dr. Kraus's November 2002 letter releasing Plaintiff to return to light work. (Tr. 285). Dr. Kraus reported that Plaintiff was having "no pain" and that his "strength is excellent." *Id*.

Similarly, about one month earlier, Dr. Landes had noted that Plaintiff had undergone the surgery with Dr. Kraus, that he was not experiencing any pain, and that he had recently returned to work. (Tr. 201).

Unfortunately, Plaintiff re-injured his back in January 2003. However, when Plaintiff saw Dr. Landes on March 20, 2003, Dr. Landes did not note that Plaintiff

reported any back or neck pain; Dr. Landes instead noted that Plaintiff had "[q]uit his job because his truck driving was slow and business was slow." (Tr. 201). As far as Plaintiff's neck condition, Dr. Landes merely said that Plaintiff's neck was supple without adenopathy. (Tr. 201). Consequently, the opinions Dr. Landes provided in January 2004, which referred in part to this time frame (March 2003), are not supported with Dr. Landes' treatment notes from March 20, 2003.

Although the ALJ could have provided a more thorough discussion of his continuing analysis of the required regulatory factors, namely those set forth in 29 C.F.R. §404.1527(d)(3)-(5), his failure to do so was at best harmless error. This is so because Dr. Landes did not cite to the medical evidence on which he relied in his November 2005 opinion, and he did not provide any supporting explanation for his opinions. In addition, the ALJ's error was at most harmless due to the contradiction between Dr. Landes' November 2005 opinion and (1) his treatment notes during the relevant time frame; (2) his recognition that Plaintiff quit his job because the trucking business had slowed; and (3) the absence of supporting objective medical evidence pre-dating Plaintiff's date last insured.

Plaintiff next argues that his mental impairment has resulted in limitations that are more restrictive than those found by the ALJ. Plaintiff asserts that the ALJ failed to properly weigh the opinions of Drs. Tanley and DeMuth, the examining and reviewing mental health sources. Plaintiff emphasizes that the ALJ erred by failing to address the limitations of low-stress work and a fast paced environment in his RFC. *See*, Doc. #9 at 13.

The ALJ discussed Dr. Tanley's November 2003 evaluation and the review of Dr.Tanley's report provided by Dr. DeMuth. (Tr. 16-17). In doing so, the ALJ did not err by overlooking these medical source opinions. In addition, the ALJ recognized at Step 2 of the sequential evaluation that Plaintiff had several severe mental impairments – adjustment disorder, pain disorder, and borderline intellectual functioning. (Tr. 22). The

ALJ's assessment of Plaintiff's Residual Functional Capacity recognized that certain mental-work restrictions – decreased concentration, an inability to perform complex tasks and diminished interpersonal skills – which limited him to jobs with minimal personal contacts. (Tr. 22). Even assuming, as Plaintiff asserts, that the ALJ should have included a limitation to low-stress work, not in a fast-paced work environment, the hypothetical questions posed to the vocational expert included such restrictions. *See* Tr. 371-73. Because the vocational expert identified a significant number of jobs available to someone with those restrictions, *see id*., the omission of those restrictions caused Plaintiff no prejudice.

Plaintiff lastly contends that the ALJ erred when evaluating Plaintiff's pain testimony because his experience of pain was reasonable in light of his underlying severe impairment. (Doc. #9 at 14-16). Plaintiffs' contentions are flawed because the credibility of his pain testimony is not supported by evidence concerning his pain levels before his date last insured. Instead, the record contains substantial evidence supporting the ALJ's credibility findings. It is uncontested that his first spinal surgery produced an excellent result by enabling him to return to light work in November 2002. Although he fell from a tanker and re-injured his back in January 2003, Dr. Landes' notes in March 2003 do not indicate that Plaintiff reported any back or neck pain. Instead, Plaintiff reported that he was not working at that time because the truck driving business was slow. It was not until September 2003 – after Plaintiff's date last insured – that he went to see Dr. Kraus about his increased pain. Although objective testing confirmed the existence of pain-causing conditions in his cervical spine, such testing post-dated Plaintiff's date last insured. Because the record contains substantial evidence supporting the ALJ's conclusion about Plaintiff's pain levels before his date last insured, particularly Dr. Landes' March 2003 notes and Dr. Kraus's November 2002 letter, the ALJ's credibility determinations are entitled to deference. *See Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997).

Accordingly, for all the above reasons, Plaintiff's Statement of Errors lacks merit.

## IT IS THEREFORE ORDERED THAT:

1. The Commissioner's final non-disability determination is affirmed; and

2. The case is terminated on the docket of this Court.


June 19, 2009                                                      s/Sharon L. Ovington
                                                                                 Sharon L. Ovington
                                                                   United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).